IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DONALD E. MEADOWS, JR. )
and AMANDA MEADOWS, )
husband and wife, )
 )
    Plaintiff, )  Civil Action No. 02-2062
 )
   v. )
 )  Magistrate Judge Amy Reynolds Hay
ANCHOR LONGWALL AND REBUILD, INC., )
a West Virginia Corporation, )
 )
    Defendant. )

---

ANCHOR LONGWALL AND REBUILD, INC., )
a West Virginia Corporation, )
 )
   Third-Party Plaintiff, )
 )
   v. )
 )
LEWIS-GOETZ AND COMPANY, INC., )
successor in interest of )
Gooding & Shields Rubber Company, )
SYSTEM STECKO, a Division of )
Dayco Europe, Ltd, )
 )
   Third-Party Defendants. )

---

LEWIS-GOETZ AND COMPANY, INC. )
successor in interest of )
Gooding & Shields Rubber Company, )
 )
   Cross-Claimant, )
 )
   v. )
 )
ANCHOR LONGWALL AND REBUILD, INC, )
a West Virginia Corporation, )
 )
   Cross-Defendant. )

OPINION and ORDER

HAY, Magistrate Judge

Plaintiffs, Donald E. Meadows, Jr. and Amanda Meadows, commenced this diversity action after Mr. Meadows was injured while installing a long wall shield at the Maple Creek Mine in Bentleyville, Pennsylvania, which was allegedly rebuilt, refurbished and/or repaired by defendant Anchor Longwall and Rebuild, Inc. ("Anchor Longwall").

It appears undisputed that plaintiff's employer, the Maple Creek Mine, contracted with Montgomery Equipment Company of Montgomery ("Montgomery"), to repair approximately 189 of its longwall shields and that Montgomery subcontracted with several repair companies, including Anchor Longwall, to perform the work.[1]  Anchor Longwall apparently refurbished 39 of the shields which required it to replace damaged components including certain hose kits and valves.[2]  Plaintiffs allege that while Mr. Meadows was pressurizing one of the refurbished shields against the mine roof a fitting located in the shut off valve, which had been replaced by Anchor Longwall, malfunctioned and pulled loose from the valve assembly housing striking Mr. Meadows on the right side of his face.[3]  As a result, Mr. Meadows has lost his right eye and suffered significant facial scarring.[4]

---

[1] See Defendant's Exhibit A: Affidavit of P. Bruce Hill ("Hill Aff."), ¶¶ 8-10 (Doc. No. 42).

[2] Id. at ¶¶ 4, 7, 10.

[3] Id. ¶ 12; Complaint ¶¶ 9, 10 (Doc. No. 1).

[4] Complaint ¶ 10.

Plaintiffs filed the instant complaint on November 29, 2002, wherein Mr. Meadows has brought claims against Anchor Longwall under theories of strict liability (Count I), negligence (Count II), and breach of warranty (Count III).  In addition, Mrs. Meadows has brought claims for emotional distress and loss of consortium (Count IV).

It also appears that Anchor Longwall has filed a third-party complaint seeking contribution and indemnification against Lewis-Goetz and Company, Inc. ("Lewis-Goetz"), the successor-in-interest to Gooding & Shields Rubber Co., which allegedly supplied the valves in question, and Systems Stecko ("Stecko"), which is purported to have designed and manufactured the valves.  In addition, Stecko has brought a counterclaim against Anchor Longwall and cross-claims against Lewis-Goetz, and Lewis-Goetz has filed cross-claims against Anchor Longwall in which contribution and indemnification have also been sought (Doc. Nos. 36, 37, 40, 57).

Presently before the Court is a motion for partial summary judgment filed by Anchor Longwall in which it argues that it is entitled to judgment on plaintiff's strict liability claim because Anchor Longwall did not sell or supply a product but merely provided a service which is not subject to strict liability.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving

party bears the initial burden of identifying evidence which demonstrates the absence of a

genuine issue of material fact.  Once that burden has been met, the non-moving party must set

forth "specific facts showing that there is a *genuine issue for trial* ... or the factual record will be

taken as presented by the moving party and judgment will be entered as a matter of law.

Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986).  An issue is

genuine only if the evidence is such that a reasonable jury could return a verdict for the non-

moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Thus, it must be

determined "'whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Brown v.

Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990), cert. denied, 501 U.S. 1218 (1991), quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.

It appears undisputed that Mr. Meadows' claim for strict liability is governed by

section 402A of the Restatement (Second) of Torts, which provides that:

> (1) One who sells any product in a defective condition
> unreasonably dangerous to the user or consumer or to his property
> is subject to liability for physical harm thereby caused to the
> ultimate user or consumer, or to his property, if
>
>> (a) the seller is engaged in the business of selling
>> such a product, and
>>
>> (b) it is expected to and does reach the user or
>> consumer without substantial change in the
>> condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
>> (a) the seller has exercised all possible care in the
>> preparation and sale of his product, and

(b) the user or consumer has not bought the product
from or entered into any contractual relation with
the seller.

Restatement (Second) of Torts, § 402A.  See Ettinger v. Triangle-Pacific Corp., 799 A.2d 95,

101-102 (Pa. Super. 2002), allocatur denied, 572 Pa. 742, 815 A.2d 1042 (2003).  See also Webb

v. Zern, 422 Pa. 424, 427, 220 A.2d 853, 854 (1966)  (Adopting section 402A as the law of the

Commonwealth).  As such, in order for section 402A to apply, a plaintiff must establish the

following elements:

(1) a product;

(2) a sale of that product;

(3) a user or consumer;

(4) a defective condition, unreasonably dangerous; and

(5) causation--that the product caused physical harm to the ultimate
user or consumer, or to his property.

Ettinger v. Triangle-Pacific Corp., 799 A.2d at 102.  "If any of these requisite elements remains

unsatisfied, § 402A has no applicability."  Id.  See Schriner v. Pennsylvania Power & Light Co.,

348 Pa. Super. 177, 185, 501 A.2d 1128, 1132 (1985).

In the instant case, Anchor Longwall contends that section 402A does not apply

because it did not sell a product but merely provided a service and, consequently, that any claim

against it necessarily revolves around its alleged defective service or workmanship which sounds

in negligence and not strict liability.  To support its position, Anchor Longwall argues that it did

not manufacture, purchase, sell or supply the shield at issue or the allegedly faulty valve that

caused Mr. Meadows' injuries but simply attached the component to the shield unaltered from

the way it was received from the manufacturer and that the shields themselves were at all times

owned by the Maple Creek Mine.[5]

Lewis-Goetz counters arguing that Anchor Longwall should be considered a seller

as defined under section 402A because it was intimately involved in the purchase of the valves

and because it placed a defective product into the stream of commerce.  It points to the fact that

the valves were not only shipped directly to Anchor Longwall but that Anchor Longwall had

direct contact with Lewis-Goetz concerning their purchase.

Indeed, the record demonstrates that Ed Groff of Anchor Longwall indicated to

Tom Falbo of Montgomery Equipment Co. in correspondence dated November 6, 2000, that

seven more hose kits were needed to complete the shield refurbishing project for Maple Creek.[6]

Mr. Falbo responded directing Mr. Groff to order the kits from Tom Warner at Lewis-Goetz's

predecessor, Gooding & Shields Rubber Co., and to charge them to Warner's account.[7]  It

appears that Mr. Groff subsequently ordered the required hose kits, according to Mr. Warner's

instructions, which were then shipped to Anchor Longwall and billed to Montgomery.[8]

The Pennsylvania Supreme Court has held that a "seller" for purposes of section

402A should be given a broad application so as to include:

> all suppliers of products who, because they are engaged in the
> business of selling or supplying a product, may be said to have
> "undertaken and assumed a special responsibility" toward the

---

[5]See Hill Aff. ¶¶ 5, 6, 11-17.

[6]See Hill Aff., Exhibit 3, p. NO540.

[7]Id.

[8]Id. at pp. NO537, NO420.

> consuming public and are in a position to spread the risk of
> defective products. *Restatement (Second) of Torts § 402A*,
> comment c.  The actual form of the transaction of such suppliers,
> whether by sale, lease, or bailment, should not alter their
> obligation.

Villari v. Terminix International, Inc., 663 F. Supp. 727, 730 (E.D. Pa. 1987), quoting Berkebile

v. Brantly Helicopter Corp., 462 Pa. 83, 93 n.3, 337 A.2d 893, 898 n.3 (1975).  The Court has

also held, however, that:

> the broadened concept of "supplier," for purposes of predicating
> strict liability, is not without practical limits.  The limits obtain in
> the purposes of the policy.  When those purposes will not be
> served, persons whose implication in supplying products is
> tangential to that undertaking will not be subjected to strict liability
> for the harms caused by defects in the products.

Cafazzo v. Central Medical Health Services, Inc., 542 Pa. 526, 530-31, 668 A.2d 521, 523-24

(1995), quoting Musser v. Vilsmeier Auction Co., 522 Pa. 367, 372, 562 A.2d 279, 281 (1989).

Here, it does not appear that Anchor Longwall is engaged in the business of

selling base lift valves or that it has assumed the responsibility of protecting the public against

the harm defective valves may cause.  Rather, it appears that Anchor Longwall is engaged in the

business of providing a repair service and the fact that it may have replaced a valve in providing

that service appears tangential to the service being rendered.  Morever, to the extent those

services were not rendered in a responsible fashion, any concomitant cause of action sounds in

negligence and not strict liability.  See Lemley v. J&B Tire Co., 426 F. Supp. 1378, 1379-80

(W.D. Pa. 1977) (Finding that the defendant company which had repaired the brakes on an

automobile that subsequently failed could not be held strictly liable because there had been no

expansion of section 402A to include persons who supply a service, because section 404 of the

Restatement provides for the liability of a repairer upon a negligence standard, and because even in hybrid sale-service transactions liability is limited to defects in the product *supplied* which had not been shown); Cafazzo v. Central Medical Health Services, Inc., 542 Pa. at 532-33, 668 A.2d at 524-25 (Finding that strict liability did not apply to the hospital or the surgeon who had implanted a defective mandibular prosthesis because they were not in the business of selling the implant and because its use was only incidental to the primary function of providing medical services.)  See also Raritan Trucking Corp. v. Aero Commander, Inc., 458 F.2d 1106, 1114-15 (3d Cir. 1972)(applying New Jersey law)(Finding that the defendant corporation which had repaired an airplane that subsequently crashed could not be held strictly liable since its paramount function was to provide services and did not produce or sell products.).  Cf. Abdul-Warith v. Arthur G. McKee and Co., 488 F. Supp. 306, 310-11 (E.D. Pa. 1980) (Finding that defendant which, while erecting blast furnaces for plaintiff's employer, installed an allegedly defective component that it had designed and constructed, was properly considered a supplier/seller for purposes of section 402A liability.)

Moreover, in the Court's view, the fact that Anchor Longwall may have been in communication with Lewis-Goetz regarding the purchase of the hose kits and valves does not render Anchor Longwall a supplier of valves.  Indeed, it appears undisputed that the purchase of the hose kits and valves was authorized and paid for by Montgomery as evidenced by the invoices Lewis-Goetz sent to Montgomery.[9]  As well, Mr. Hill, the Vice president of Anchor Longwall, and its corporate representative, Chad Underkoffler, have both attested to the fact that

---

[9]Hill Aff., Exh. 3.

the valves were purchased by Montgomery and shipped to Anchor Longwall.[10]  Under these

circumstances, to the extent Anchor Longwall is implicated in "supplying" the valve, that act

appears tangential or ancillary to its primary undertaking of refurbishing longwall shields and

precludes a finding that strict liability is appropriately imposed.  See Cafazzo v. Central Medical

Health Services, Inc., 542 Pa. at 532-33, 668 A.2d at 524-25; Musser v. Vilsmeier Auction Co.,

522 Pa. at 372, 562 A.2d at 281.

   In this manner, Villari v. Terminix International, Inc., 663 F. Supp. 727 (E.D. Pa.

1987) ("Villari"), upon which Lewis-Goetz has relied, is easily distinguishable from the instant

case as in Villari, there was no question that the defendant supplied the hazardous termiticide

which was the allegedly defective product at issue.  Indeed, the record showed that defendant was

under contract with the manufacturer of the product as the sole supplier of the termiticide in the

United States.  Moreover, unlike the instant case, the termiticide was not merely tangential to the

service provided but was, in fact, part and parcel to defendant's business of chemically

controlling termites.  Id. at 728, 729-30.

   Plaintiffs have also filed a response to Anchor Longwall's motion in which they

argue that there are issues of fact regarding Anchor Longwall's role as a seller.[11]  Specifically,

---

[10]Hill Aff. ¶ 12; Stecko Appendix 1: Deposition of Chad Underkoffler, p. 66 (Doc. No. 50).

[11]Plaintiffs' response to Anchor Longwall's motion and an accompanying brief were apparently submitted to the Clerk of Court on a disc as their counsel had not yet converted to electronic filing at that time.  Through no fault of plaintiffs, only their response was docketed and not the brief.  Having been made aware of the error, the Court recently retrieved the disc and plaintiffs' brief has now been docketed.  Thus, although the docket number appears out of sequence on the docket sheet, it was, in fact, submitted in a timely fashion and has been duly considered by the Court.

plaintiffs argue that Pennsylvania Courts have "routinely imposed strict liability" for harm caused by product defects in non-sale commercial transactions where the product has been distributed to the consumer and that because Anchor Longwall is in the business of distributing rebuilt products, thereby causing them to reenter the stream of commerce, strict liability should apply.

Notwithstanding that plaintiffs have not cited to any of the Pennsylvania cases where strict liability has been routinely imposed in non-sale commercial transactions, plaintiffs have not pointed to any evidence of record which suggests that Anchor Longwall was in the business of selling or distributing either Stecko valves or longwall shields.  Indeed, the only evidence of record cited by plaintiffs is the deposition testimony of Chad Underkoffler in which he purports to have testified that Anchor Longwall specified, purchased and installed the defective Stecko valve at issue.  Review of Mr. Underkoffler's testimony, however, does not support a finding that Anchor Longwall specified or purchased the defective valve.

Indeed, after indicating that he was unfamiliar with the prices of valves generally and having then been asked, "Who does that at Anchor?," Mr. Underkoffler responded that, "If we were to buy a valve, we would spec it out as what we wanted to use and the pricing would be done through purchasing ...."[12]  He did not testify, as plaintiffs have suggested, that Anchor Longwall chose the Stecko valve to install in the Maple Creek shields or that it purchased those valves. In fact, as previously discussed, Mr. Underkoffler went on to testify that the hose kits were supplied by Montgomery which is also consistent with Mr. Hill's affidavit.[13]

---

[12]Underkoffler Depo., p. 29.

[13]Underkoffler Depo., pp. 62, 66; Hill Aff. ¶ 12.

Plaintiffs also point to the fact that when asked what was the scope of work to be done for Montgomery, Mr. Underkoffler stated that Anchor Longwall was to raise the shield, clean it, inspect it, remove faulty valves and "install a supplied hose kit to their spec" which was "made up when the shield was reviewed."[14]  Plaintiffs again suggest that this testimony evidences that Anchor Longwall specified what valve should be used in the refurbishing process and then caused the shield with the defective component to reenter the stream of commerce.  Because placing the shields back in the stream of commerce is part of Anchor Longwall's business, plaintiffs argue that the nature of the transaction remains a sale.

Mr. Underkoffler's testimony, however, was that Anchor Longwall was to install the supplied hose kits to "*their* spec," not *our* spec, which is consistent with Anchor Longwall's representations that it replaced the faulty valves with those as specified and initially installed by the manufacturer Meco-Dowty.[15]  Moreover, Anchor Longwall has also represented, and plaintiffs do not dispute, that the shields were at all times owned by the Maple Creek Mine.  The fact that they were in Anchor Longwall's possession for a period of time so that they could be repaired does not mean that when they were returned to the mine they were placed back in the stream of commerce or that a sale transpired.  Indeed, as previously discussed, Anchor Longwall was hired to provide a service.  The fact that providing that service required it to replace a valve does not render it a supplier of valves, a seller of valves or a marketer of valves.  See Snyder v. ISC Alloys, Ltd., 772 F. Supp. 244, 251-52 (W.D. Pa. 1991) ("[T]he fact of mass marketing, or at least some marketing, is an essential element of a claim of strict products liability").  Thus, in the

---

[14]Underkoffler Depo. pp. 61-62.

[15]Anchor Longwall's Brief in Support of Motion for Partial Summary Judgment, p. 12.

Court's view, Mr. Underkoffler's testimony does not support a finding that Anchor Longwall

specified or purchased the replacement valves or that it caused the valves or the shields to reenter

the stream of commerce.

In this manner, Kalumetals, Inc. v. Hitachi Magnetics Corp., 21 F. Supp. 2d 510

(W.D. Pa. 1998), upon which plaintiffs rely for the proposition that repairing a product is no

different than  manufacturing or selling a product since under both circumstances the product is

placed in the stream of commerce, is distinguishable.  In Kalumetals, the plaintiff was hired by

the defendant to dry a grinding swarf comprised of fine metalic grindings and grinding fluid.  The

defendant would ship the swarf to the plaintiff which would perform the service at its plant.

After successfully performing the service on several occasions, the plaintiff received another

shipment for drying which, during the process, exploded causing damage to the plaintiff's

property and business.  The plaintiff brought suit alleging that the last shipment was

contaminated by another product manufactured by the defendant and that the defendant should be

held strictly liable for failing to notify it of the product's content and failing to provide the proper

warnings.  The defendant sought summary judgment on the plaintiff's strict liability claims

arguing, *inter alia*, that it should not be considered a seller for purposes of strict liability.  The

Court disagreed, finding that by providing the allegedly defective swarf to the plaintiff for

processing, the defendant had arguably placed it into the stream of commerce for use by the

"consuming public."  Id. at 515-516.

The most notable distinction between Kalumetals and the instant case is that in

Kalumetals the allegedly defective product was not supplied or placed in the stream of commerce

by the party performing the repair service as plaintiffs here have alleged.  Rather, the product

which caused the harm in <u>Kalumetals</u> was supplied by the party which owned the product and

sought to have the "refurbishing" performed.  Thus, as the Court found, the defendant had

arguably placed the product into the stream of commerce for use by the plaintiff company and its

employees which the Court likened to consumers.  Here, however, Anchor Longwall did not

place its own product into the stream of commerce for public use but merely returned the shield

to its owner for which it had performed a service.  Thus, <u>Kalumetals</u> does not further plaintiff's

position that providing a repair service is akin to manufacturing or selling a product for purposes

of 402A liability.

    Finally, we note that plaintiffs have argued that public policy considerations

justify imposing strict liability on Anchor Longwall because public consumers have the right to

expect sellers to stand behind their goods and provide them with products that are reasonably free

from defects and that the burden of injury caused by defective products is more appropriately

borne by the manufacturers and sellers than by consumers such as Mr. Meadows.  <u>See</u> <u>Musser v.</u>

<u>Vilsmeier Auction Co.</u>, 522 Pa. at 371-72, 562 A.2d at 281.  While the Court does not disagree

with the policy considerations cited by plaintiffs and is not unsympathetic to Mr. Meadow's

plight, it does not agree that Anchor Longwall is the business entity that should strictly bear the

risk of harm under the circumstances of this case since, as previously discussed, it is not in the

business of manufacturing, selling or supplying Stecko valves or longwall shields and, thus, has

not assumed the "special responsibility" toward the consuming public to ensure that such

products are safe.  <u>See</u> <u>Villari v. Terminix International, Inc.</u>, 663 F. Supp. at 730.[16]

---

[16]We note here that Lewis-Goetz and plaintiffs have also cited to <u>Musser v. Vilsmeier</u>
<u>Auction Co.</u>, <u>supra</u>, as setting forth certain factors that should be considered in determining
whether Anchor Longwall is properly considered a seller.  Under the Court's reading of <u>Musser</u>,

Stecko has responded to Anchor Longwall's motion as well initially arguing, much as plaintiffs have, that genuine issues of fact exist with respect to whether Anchor Longwall supplied the defective product at issue. To support its position, however, Stecko relies on the invoices Anchor Longwall submitted to Montgomery in which it billed Montgomery $377.56 for, *inter alia*, "materials," and contends that because any of these materials or some other part supplied by Anchor Longwall, such as a bolt or a screw, could have caused Mr. Meadows' injuries summary judgment should be denied. The difficulty with Stecko's argument, however, is that plaintiffs have specifically alleged in the complaint that plaintiff was injured when a "fitting located in a shut off valve ... malfunctioned and pulled loose from the valve assembly housing," striking Mr. meadows on the right side of his face.[17] Thus, the defective product at issue, according to plaintiffs, is the valve and not some other product that Anchor Longwall may have purchased or supplied.[18]

Stecko also argues, much as Lewis-Goetz has, that even if the defective valves supplied by Montgomery caused Mr. Meadows' injuries Anchor Longwall should be held strictly liable for passing them on in the chain of distribution particularly because Anchor Longwall was responsible for testing the shields before returning them to the mining company.

---

however, the cited factors are relevant to determine whether the imposition of strict liability is warranted once the defendant's status as a supplier has already been decided. Id. at 373-74. See Cafazzo v. Central Medical Health Services, Inc., 542 Pa. at 534, 668 A.2d at 525. Because the Court has determined that Anchor Longwall is not a seller or supplier in the first instance it need not address the Musser test.

[17]Complaint ¶¶ 9, 10.

[18]In this manner, Stecko's suggestion that Anchor Longwall's motion should be denied until such time as it can conduct discovery regarding products that Anchor Longwall may have supplied, is equally unavailing as the product at issue is clearly the valve.

Stecko's argument, however, appears to overlook the fact that in order to be held strictly liable

under section 402A, it still must be shown that the defendant was the seller or supplier of the

defective product.  Ettinger v. Triangle-Pacific Corp., 799 A.2d at 102.  Here, as previously

discussed, Anchor Longwall was neither.  The mere fact that the valves were at one time in its

possession does not appear sufficient to constitute a sale or suggest that Anchor Longwall is in

the business of selling valves and, thus, does not satisfy the requirements of section 402A.

Moreover, as argued by Anchor Longwall, to the extent it failed to exercise proper care in

installing the valves or testing the shields suggests a cause of action in negligence and not strict

liability.  See Dahlstrom v. Shrum, 368 Pa. 423, 425, 84 A.2d 289, 290 (1951) ("Negligence is

defined as the absence of care under the circumstances.").

       For these reasons, the motion for partial summary judgment submitted on behalf

of defendant Anchor Longwall and Rebuild, Inc. will be granted.

Dated: 17 April, 2006.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DONALD E. MEADOWS, JR.   )
and AMANDA MEADOWS,   )
husband and wife,     )
           )
    Plaintiff,   )  Civil Action No. 02-2062
           )
  v.       )
           )  Magistrate Judge Amy Reynolds Hay
ANCHOR LONGWALL AND REBUILD, INC., )
a West Virginia Corporation,  )
           )
    Defendant.  )

_____

ANCHOR LONGWALL AND REBUILD, INC., )
a West Virginia Corporation,  )
           )
    Third-Party Plaintiff, )
           )
  v.       )
           )
LEWIS-GOETZ AND COMPANY, INC., )
successor in interest of   )
Gooding & Shields Rubber Company, )
SYSTEM STECKO, a Division of )
Dayco Europe, Ltd,   )
           )
    Third-Party Defendants. )

_____

LEWIS-GOETZ AND COMPANY, INC. )
successor in interest of   )
Gooding & Shields Rubber Company, )
           )
    Cross-Claimant, )
           )
  v.       )
           )
ANCHOR LONGWALL AND REBUILD, INC, )
a West Virginia Corporation,  )
           )
    Cross-Defendant. )

## ORDER

AND NOW, this 17th day of April, 2006, upon consideration of the Motion for

Partial Summary Judgment submitted by defendant Anchor Longwall and Rebuild, Inc., and all

responses in opposition thereto, IT IS HEREBY ORDERED that the motion (doc. 42) is

GRANTED.

IT IS FURTHER ORDERED that judgment is entered in favor of defendant

Anchor Longwall and Rebuild, Inc., and against the plaintiffs, Donald E. Meadows, Jr. and

Amanda Meadows, as to their strict liability claim set forth in Count I of the complaint.

By the Court,

/s/   Amy Reynolds Hay
AMY REYNOLDS HAY
United States Magistrate Judge

cc:    Richard J. Schubert, Esquire
Lydon & Schubert
825 Grant Building
Pittsburgh, PA 15219

Kathleen S. McAllister, Esquire
DiBella & Geer, P.C.
312 Boulevard of the Allies
Third Floor
Pittsburgh, PA 15222

Lynn E. Bell, Esquire
Davies, McFarland & Carroll, P.C.
One Gateway Center
10th Floor
Pittsburgh, PA 15222

Stanley A. Winikoff, Esquire
Swartz Campbell LLC
4750 U.S. Steel Tower
600 Grant Street
Pittsburgh, PA 15219